(Slip Opinion) OCTOBER TERM, 2015 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## RJR NABISCO, INC., ET AL. *v.* EUROPEAN COMMUNITY ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 15–138.   Argued March 21, 2016—Decided June 20, 2016

The Racketeer Influenced and Corrupt Organizations Act (RICO) prohibits certain activities of organized crime groups in relation to an enterprise. RICO makes it a crime to invest income derived from a pattern of racketeering activity in an enterprise "which is engaged in, or the activities of which affect, interstate or foreign commerce," 18 U. S. C. §1962(a); to acquire or maintain an interest in an enterprise through a pattern of racketeering activity, §1962(b); to conduct an enterprise's affairs through a pattern of racketeering activity, §1962(c); and to conspire to violate any of the other three prohibitions, §1962(d). RICO also provides a civil cause of action for "[a]ny person injured in his business or property by reason of a violation" of those prohibitions. §1964(c).

Respondents (the European Community and 26 of its member states) filed suit under RICO, alleging that petitioners (RJR Nabisco and related entities (collectively RJR)) participated in a global money-laundering scheme in association with various organized crime groups. Under the alleged scheme, drug traffickers smuggled narcotics into Europe and sold them for euros that—through transactions involving black-market money brokers, cigarette importers, and wholesalers—were used to pay for large shipments of RJR cigarettes into Europe. The complaint alleged that RJR violated §§1962(a)–(d) by engaging in a pattern of racketeering activity that included numerous predicate acts of money laundering, material support to foreign terrorist organizations, mail fraud, wire fraud, and violations of the Travel Act. The District Court granted RJR's motion to dismiss on the ground that RICO does not apply to racketeering activity occurring outside U. S. territory or to foreign enterprises. The Second

Circuit reinstated the claims, however, concluding that RICO applies extraterritorially to the same extent as the predicate acts of racketeering that underlie the alleged RICO violation, and that certain predicates alleged in this case expressly apply extraterritorially. In denying rehearing, the court held further that RICO's civil action does not require a domestic injury, but permits recovery for a foreign injury caused by the violation of a predicate statute that applies extraterritorially.

*Held*:

1. The law of extraterritoriality provides guidance in determining RICO's reach to events outside the United States. The Court applies a canon of statutory construction known as the presumption against extraterritoriality: Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application. *Morrison* v. *National Australia Bank Ltd.*, 561 U. S. 247, 255. *Morrison* and *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U. S. ___, reflect a two-step framework for analyzing extraterritoriality issues. First, the Court asks whether the presumption against extraterritoriality has been rebutted—*i.e.,* whether the statute gives a clear, affirmative indication that it applies extraterritorially. This question is asked regardless of whether the particular statute regulates conduct, affords relief, or merely confers jurisdiction. If, and only if, the statute is not found extraterritorial at step one, the Court moves to step two, where it examines the statute's "focus" to determine whether the case involves a domestic application of the statute. If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the relevant conduct occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of whether other conduct occurred in U. S. territory. In the event the statute is found to have clear extraterritorial effect at step one, then the statute's scope turns on the limits Congress has or has not imposed on the statute's foreign application, and not on the statute's "focus." Pp. 7–10.

2. The presumption against extraterritoriality has been rebutted with respect to certain applications of RICO's substantive prohibitions in §1962. Pp. 10–18.

(a) RICO defines racketeering activity to include a number of predicates that plainly apply to at least some foreign conduct, such as the prohibition against engaging in monetary transactions in criminally derived property, §1957(d)(2), the prohibitions against the assassination of Government officials, §§351(i), 1751(k), and the prohibition against hostage taking, §1203(b). Congress has thus given a clear, affirmative indication that §1962 applies to foreign racketeer-

ing activity—but only to the extent that the predicates alleged in a particular case themselves apply extraterritorially. This fact is determinative as to §§1962(b) and (c), which both prohibit the employment of a pattern of racketeering. But §1962(a), which targets certain uses of income derived from a pattern of racketeering, arguably extends only to domestic uses of that income. Because the parties have not focused on this issue, and because its resolution does not affect this case, it is assumed that respondents have pleaded a domestic investment of racketeering income in violation of §1962(a). It is also assumed that the extraterritoriality of a violation of RICO's conspiracy provision, §1962(d), tracks that of the RICO provision underlying the alleged conspiracy. Pp. 10–14.

(b) RJR contends that RICO's "focus" is its enterprise element, which gives no clear indication of extraterritorial effect. But focus is considered only when it is necessary to proceed to the inquiry's second step. See *Morrison, supra,* at 267, n. 9. Here, however, there is a clear indication at step one that at least §§1962(b) and (c) apply to all transnational patterns of racketeering, subject to the stated limitation. A domestic enterprise requirement would lead to difficult line-drawing problems and counterintuitive results, such as excluding from RICO's reach foreign enterprises that operate within the United States. Such troubling consequences reinforce the conclusion that Congress intended the §§1962(b) and (c) prohibitions to apply extraterritorially in tandem with the underlying predicates, without regard to the locus of the enterprise. Of course, foreign enterprises will qualify only if they engage in, or significantly affect, commerce directly involving the United States. Pp. 14–17.

(c) Applying these principles here, respondents' allegations that RJR violated §§1962(b) and (c) do not involve an impermissibly extraterritorial application of RICO. The Court assumes that the alleged pattern of racketeering activity consists entirely of predicate offenses that were either committed in the United States or committed in a foreign country in violation of a predicate statute that applies extraterritorially. The alleged enterprise also has a sufficient tie to U. S. commerce, as its members include U. S. companies and its activities depend on sales of RJR's cigarettes conducted through "the U. S. mails and wires," among other things. Pp. 17–18.

3. Irrespective of any extraterritoriality of §1962's substantive provisions, §1964(c)'s private right of action does not overcome the presumption against extraterritoriality, and thus a private RICO plaintiff must allege and prove a domestic injury. Pp. 18–27.

(a) The Second Circuit reasoned that the presumption against extraterritoriality did not apply to §1964(c) independently of its application to §1962's substantive provisions because §1964(c) does not

regulate conduct. But this view was rejected in *Kiobel*, 569 U. S., at ___, and the logic of that decision requires that the presumption be applied separately to RICO's cause of action even though it has been overcome with respect to RICO's substantive prohibitions. As in other contexts, allowing recovery for foreign injuries in a civil RICO action creates a danger of international friction that militates against recognizing foreign-injury claims without clear direction from Congress. Respondents, in arguing that such concerns are inapplicable here because the plaintiffs are not foreign citizens seeking to bypass their home countries' less generous remedies but are foreign countries themselves, forget that this Court's interpretation of §1964(c)'s injury requirement will necessarily govern suits by nongovernmental plaintiffs. The Court will not forgo the presumption against extraterritoriality to permit extraterritorial suits based on a case-by-case inquiry that turns on or looks to the affected sovereign's consent. Nor will the Court adopt a double standard that would treat suits by foreign sovereigns more favorably than other suits. Pp. 18–22.

(b) Section 1964(c) does not provide a clear indication that Congress intended to provide a private right of action for injuries suffered outside of the United States. It provides a cause of action to "[a]ny person injured in his business or property" by a violation of §1962, but neither the word "any" nor the reference to injury to "business or property" indicates extraterritorial application. Respondents' arguments to the contrary are unpersuasive. In particular, while they are correct that RICO's private right of action was modeled after §4 of the Clayton Act, which allows recovery for injuries suffered abroad as a result of antitrust violations, see *Pfizer Inc.* v. *Government of India*, 434 U. S. 308, 314–315, this Court has declined to transplant features of the Clayton Act's cause of action into the RICO context where doing so would be inappropriate. Cf. *Sedima, S. P. R. L.* v. *Imrex Co.*, 473 U. S. 479, 485, 495. There is good reason not to do so here. Most importantly, RICO lacks the very language that the Court found critical to its decision in *Pfizer,* namely, the Clayton Act's definition of a "person" who may sue, which "explicitly includes 'corporations and associations existing under or authorized by . . . the laws of any foreign country,' " 434 U. S., at 313. Congress's more recent decision to exclude from the antitrust laws' reach most conduct that "causes only foreign injury," *F. Hoffmann-La Roche Ltd* v. *Empagran S. A.*, 542 U. S. 155, 158, also counsels against importing into RICO those Clayton Act principles that are at odds with the Court's current extraterritoriality doctrine. Pp. 22–27.

(c) Section 1964(c) requires a civil RICO plaintiff to allege and prove a domestic injury to business or property and does not allow recovery for foreign injuries. Respondents waived their domestic injury

Syllabus

damages claims, so the District Court dismissed them with prejudice. Their remaining RICO damages claims therefore rest entirely on injury suffered abroad and must be dismissed.  P. 27.

764 F. 3d 129, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY and THOMAS, JJ., joined, and in which GINSBURG, BREYER, and KAGAN, JJ., joined as to Parts I, II, and III.  GINSBURG, J., filed an opinion concurring in part, dissenting in part, and dissenting from the judgment, in which BREYER and KAGAN, JJ., joined.  BREYER, J., filed an opinion concurring in part, dissenting in part, and dissenting from the judgment.  SOTOMAYOR, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 15–138

RJR NABISCO, INC., ET AL., PETITIONERS *v.*
EUROPEAN COMMUNITY, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 20, 2016]

JUSTICE ALITO delivered the opinion of the Court.

The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U. S. C. §§1961–1968, created four new criminal offenses involving the activities of organized criminal groups in relation to an enterprise. §§1962(a)–(d). RICO also created a new civil cause of action for "[a]ny person injured in his business or property by reason of a violation" of those prohibitions. §1964(c). We are asked to decide whether RICO applies extraterritorially—that is, to events occurring and injuries suffered outside the United States.

I

A

RICO is founded on the concept of racketeering activity. The statute defines "racketeering activity" to encompass dozens of state and federal offenses, known in RICO parlance as predicates. These predicates include any act "indictable" under specified federal statutes, §§1961(1)(B)–(C), (E)–(G), as well as certain crimes "chargeable" under state law, §1961(1)(A), and any offense involving bankruptcy or securities fraud or drug-related activity that is

"punishable" under federal law, §1961(1)(D). A predicate offense implicates RICO when it is part of a "pattern of racketeering activity"—a series of related predicates that together demonstrate the existence or threat of continued criminal activity. *H. J. Inc.* v. *Northwestern Bell Telephone Co.*, 492 U. S. 229, 239 (1989); see §1961(5) (specifying that a "pattern of racketeering activity" requires at least two predicates committed within 10 years of each other).

RICO's §1962 sets forth four specific prohibitions aimed at different ways in which a pattern of racketeering activity may be used to infiltrate, control, or operate "a[n] enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." These prohibitions can be summarized as follows. Section 1962(a) makes it unlawful to invest income derived from a pattern of racketeering activity in an enterprise. Section 1962(b) makes it unlawful to acquire or maintain an interest in an enterprise through a pattern of racketeering activity. Section 1962(c) makes it unlawful for a person employed by or associated with an enterprise to conduct the enterprise's affairs through a pattern of racketeering activity. Finally, §1962(d) makes it unlawful to conspire to violate any of the other three prohibitions.[1]

---

[1] In full, 18 U. S. C. §1962 provides:

"(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser,

Violations of §1962 are subject to criminal penalties, §1963(a), and civil proceedings to enforce those prohibitions may be brought by the Attorney General, §§1964(a)–(b). Separately, RICO creates a private civil cause of action that allows "[a]ny person injured in his business or property by reason of a violation of section 1962" to sue in federal district court and recover treble damages, costs, and attorney's fees. §1964(c).[2]

———————

the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

"(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

"(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

"(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

The attentive reader will notice that these prohibitions concern not only patterns of racketeering activity but also the collection of unlawful debt. As is typical in our RICO cases, we have no occasion here to address this aspect of the statute.

[2] In full, §1964(c) provides:

"Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final."

### B

This case arises from allegations that petitioners—RJR Nabisco and numerous related entities (collectively RJR)—participated in a global money-laundering scheme in association with various organized crime groups. Respondents—the European Community and 26 of its member states—first sued RJR in the Eastern District of New York in 2000, alleging that RJR had violated RICO. Over the past 16 years, the resulting litigation (spread over at least three separate actions, with this case the lone survivor) has seen multiple complaints and multiple trips up and down the federal court system. See 2011 WL 843957, *1–*2 (EDNY, Mar. 8, 2011) (tracing the procedural history through the District Court's dismissal of the present complaint). In the interest of brevity, we confine our discussion to the operative complaint and its journey to this Court.

Greatly simplified, the complaint alleges a scheme in which Colombian and Russian drug traffickers smuggled narcotics into Europe and sold the drugs for euros that—through a series of transactions involving black-market money brokers, cigarette importers, and wholesalers—were used to pay for large shipments of RJR cigarettes into Europe. In other variations of this scheme, RJR allegedly dealt directly with drug traffickers and money launderers in South America and sold cigarettes to Iraq in violation of international sanctions. RJR is also said to have acquired Brown & Williamson Tobacco Corporation for the purpose of expanding these illegal activities.

The complaint alleges that RJR engaged in a pattern of racketeering activity consisting of numerous acts of money laundering, material support to foreign terrorist organizations, mail fraud, wire fraud, and violations of the Travel Act. RJR, in concert with the other participants in the scheme, allegedly formed an association in fact that was engaged in interstate and foreign commerce, and therefore

constituted a RICO enterprise that the complaint dubs the "RJR Money-Laundering Enterprise." App. to Pet. for Cert. 238a, Complaint ¶158; see §1961(4) (defining an enterprise to include "any union or group of individuals associated in fact although not a legal entity").

Putting these pieces together, the complaint alleges that RJR violated each of RICO's prohibitions. RJR allegedly used income derived from the pattern of racketeering to invest in, acquire an interest in, and operate the RJR Money-Laundering Enterprise in violation of §1962(a); acquired and maintained control of the enterprise through the pattern of racketeering in violation of §1962(b); operated the enterprise through the pattern of racketeering in violation of §1962(c); and conspired with other participants in the scheme in violation of §1962(d).[3] These violations allegedly harmed respondents in various ways, including through competitive harm to their state-owned cigarette businesses, lost tax revenue from black-market cigarette sales, harm to European financial institutions, currency instability, and increased law enforcement costs.[4]

RJR moved to dismiss the complaint, arguing that RICO does not apply to racketeering activity occurring outside U. S. territory or to foreign enterprises. The District Court agreed and dismissed the RICO claims as impermissibly extraterritorial. 2011 WL 843957, at *7.

————————

[3] The complaint also alleges that RJR committed a variety of state-law torts. Those claims are not before us.

[4] At an earlier stage of respondents' litigation against RJR, the Second Circuit "held that the revenue rule barred the foreign sovereigns' civil claims for recovery of lost tax revenue and law enforcement costs." *European Community* v. *RJR Nabisco, Inc.*, 424 F. 3d 175, 178 (2005) (Sotomayor, J.), cert. denied, 546 U. S. 1092 (2006). It is unclear why respondents subsequently included these alleged injuries in their present complaint; they do not ask us to disturb or distinguish the Second Circuit's holding that such injuries are not cognizable. We express no opinion on the matter. Cf. *Pasquantino* v. *United States*, 544 U. S. 349, 355, n. 1 (2005).

The Second Circuit reinstated the RICO claims. It concluded that, "with respect to a number of offenses that constitute predicates for RICO liability and are alleged in this case, Congress has clearly manifested an intent that they apply extraterritorially." 764 F. 3d 129, 133 (2014). "By incorporating these statutes into RICO as predicate racketeering acts," the court reasoned, "Congress has clearly communicated its intention that RICO apply to extraterritorial conduct to the extent that extraterritorial violations of these statutes serve as the basis for RICO liability." *Id.*, at 137. Turning to the predicates alleged in the complaint, the Second Circuit found that they passed muster. The court concluded that the money laundering and material support of terrorism statutes expressly apply extraterritorially in the circumstances alleged in the complaint. *Id.,* at 139–140. The court held that the mail fraud, wire fraud, and Travel Act statutes do *not* apply extraterritorially. *Id.,* at 141. But it concluded that the complaint states *domestic* violations of those predicates because it "allege[s] conduct in the United States that satisfies every essential element" of those offenses. *Id.,* at 142.

RJR sought rehearing, arguing (among other things) that RICO's civil cause of action requires a plaintiff to allege a domestic *injury*, even if a domestic pattern of racketeering or a domestic enterprise is not necessary to make out a violation of RICO's substantive prohibitions. The panel denied rehearing and issued a supplemental opinion holding that RICO does not require a domestic injury. 764 F. 3d 149 (CA2 2014) (*per curiam*). If a foreign injury was caused by the violation of a predicate statute that applies extraterritorially, the court concluded, then the plaintiff may seek recovery for that injury under RICO. *Id.,* at 151. The Second Circuit later denied rehearing en banc, with five judges dissenting. 783 F. 3d 123 (2015).

The lower courts have come to different conclusions regarding RICO's extraterritorial application. Compare 764 F. 3d 129 (case below) (holding that RICO may apply extraterritorially) with *United States* v. *Chao Fan Xu*, 706 F. 3d 965, 974–975 (CA9 2013) (holding that RICO does not apply extraterritorially; collecting cases). Because of this conflict and the importance of the issue, we granted certiorari. 576 U. S. \_\_\_ (2015).

II

The question of RICO's extraterritorial application really involves two questions. First, do RICO's substantive prohibitions, contained in §1962, apply to conduct that occurs in foreign countries? Second, does RICO's private right of action, contained in §1964(c), apply to injuries that are suffered in foreign countries? We consider each of these questions in turn. To guide our inquiry, we begin by reviewing the law of extraterritoriality.

It is a basic premise of our legal system that, in general, "United States law governs domestically but does not rule the world." *Microsoft Corp.* v. *AT&T Corp.*, 550 U. S. 437, 454 (2007). This principle finds expression in a canon of statutory construction known as the presumption against extraterritoriality: Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application. *Morrison* v. *National Australia Bank Ltd.*, 561 U. S. 247, 255 (2010). The question is not whether we think "Congress would have wanted" a statute to apply to foreign conduct "if it had thought of the situation before the court," but whether Congress has affirmatively and unmistakably instructed that the statute will do so. *Id.,* at 261. "When a statute gives no clear indication of an extraterritorial application, it has none." *Id.,* at 255.

There are several reasons for this presumption. Most notably, it serves to avoid the international discord that

can result when U. S. law is applied to conduct in foreign countries. See, *e.g.*, *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U. S. \_\_\_, \_\_\_–\_\_\_ (2013) (slip op., at 4–5); *EEOC* v. *Arabian American Oil Co.*, 499 U. S. 244, 248 (1991) (*Aramco*); *Benz* v. *Compania Naviera Hidalgo, S. A.*, 353 U. S. 138, 147 (1957). But it also reflects the more prosaic "commonsense notion that Congress generally legislates with domestic concerns in mind." *Smith* v. *United States*, 507 U. S. 197, 204, n. 5 (1993). We therefore apply the presumption across the board, "regardless of whether there is a risk of conflict between the American statute and a foreign law." *Morrison*, *supra*, at 255.

Twice in the past six years we have considered whether a federal statute applies extraterritorially. In *Morrison*, we addressed the question whether §10(b) of the Securities Exchange Act of 1934 applies to misrepresentations made in connection with the purchase or sale of securities traded only on foreign exchanges. We first examined whether §10(b) gives any clear indication of extraterritorial effect, and found that it does not. 561 U. S., at 262–265. We then engaged in a separate inquiry to determine whether the complaint before us involved a permissible *domestic* application of §10(b) because it alleged that some of the relevant misrepresentations were made in the United States. At this second step, we considered the "'focus' of congressional concern," asking whether §10(b)'s focus is "the place where the deception originated" or rather "purchases and sale of securities in the United States." *Id.,* at 266. We concluded that the statute's focus is on domestic securities transactions, and we therefore held that the statute does not apply to frauds in connection with foreign securities transactions, even if those frauds involve domestic misrepresentations.

In *Kiobel,* we considered whether the Alien Tort Statute (ATS) confers federal-court jurisdiction over causes of action alleging international-law violations committed

overseas. We acknowledged that the presumption against extraterritoriality is "typically" applied to statutes "regulating conduct," but we concluded that the principles supporting the presumption should "similarly constrain courts considering causes of action that may be brought under the ATS." 569 U. S., at \_\_\_ (slip op., at 5). We applied the presumption and held that the ATS lacks any clear indication that it extended to the foreign violations alleged in that case. *Id.,* at \_\_\_–\_\_\_ (slip op., at 7–14). Because "all the relevant conduct" regarding those violations "took place outside the United States," *id.,* at \_\_\_ (slip op., at 14), we did not need to determine, as we did in *Morrison*, the statute's "focus."

*Morrison* and *Kiobel* reflect a two-step framework for analyzing extraterritoriality issues. At the first step, we ask whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially. We must ask this question regardless of whether the statute in question regulates conduct, affords relief, or merely confers jurisdiction. If the statute is not extraterritorial, then at the second step we determine whether the case involves a domestic application of the statute, and we do this by looking to the statute's "focus." If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U. S. territory.

What if we find at step one that a statute clearly *does* have extraterritorial effect? Neither *Morrison* nor *Kiobel* involved such a finding. But we addressed this issue in *Morrison*, explaining that it was necessary to consider §10(b)'s "focus" only because we found that the statute

does not apply extraterritorially: "If §10(b) did apply abroad, we would not need to determine which transnational frauds it applied to; it would apply to all of them (barring some other limitation)." 561 U. S., at 267, n. 9. The scope of an extraterritorial statute thus turns on the limits Congress has (or has not) imposed on the statute's foreign application, and not on the statute's "focus."[5]

### III

With these guiding principles in mind, we first consider whether RICO's substantive prohibitions in §1962 may apply to foreign conduct. Unlike in *Morrison* and *Kiobel*, we find that the presumption against extraterritoriality has been rebutted—but only with respect to certain applications of the statute.

### A

The most obvious textual clue is that RICO defines racketeering activity to include a number of predicates that plainly apply to at least some foreign conduct. These predicates include the prohibition against engaging in monetary transactions in criminally derived property, which expressly applies, when "the defendant is a United States person," to offenses that "tak[e] place outside the United States." 18 U. S. C. §1957(d)(2). Other examples include the prohibitions against the assassination of Government officials, §351(i) ("There is extraterritorial jurisdiction over the conduct prohibited by this section"); §1751(k) (same), and the prohibition against hostage taking, which applies to conduct that "occurred outside the United States" if either the hostage or the offender is a

---

[5] Because a finding of extraterritoriality at step one will obviate step two's "focus" inquiry, it will usually be preferable for courts to proceed in the sequence that we have set forth. But we do not mean to preclude courts from starting at step two in appropriate cases. Cf. *Pearson* v. *Callahan*, 555 U. S. 223, 236–243 (2009).

U. S. national, if the offender is found in the United States, or if the hostage taking is done to compel action by the U. S. Government, §1203(b). At least one predicate— the prohibition against "kill[ing] a national of the United States, while such national is outside the United States"— applies *only* to conduct occurring outside the United States. §2332(a).

We agree with the Second Circuit that Congress's incorporation of these (and other) extraterritorial predicates into RICO gives a clear, affirmative indication that §1962 applies to foreign racketeering activity—but only to the extent that the predicates alleged in a particular case themselves apply extraterritorially. Put another way, a pattern of racketeering activity may include or consist of offenses committed abroad in violation of a predicate statute for which the presumption against extraterritoriality has been overcome. To give a simple (albeit grim) example, a violation of §1962 could be premised on a pattern of killings of Americans abroad in violation of §2332(a)—a predicate that all agree applies extraterritorially—whether or not any domestic predicates are also alleged.[6]

We emphasize the important limitation that foreign conduct must violate "a predicate statute that manifests an unmistakable congressional intent to apply extraterritorially." 764 F. 3d, at 136. Although a number of RICO predicates have extraterritorial effect, many do not. The inclusion of *some* extraterritorial predicates does not mean that *all* RICO predicates extend to foreign conduct. This is apparent for two reasons. First, "when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that

——————

[6]The foreign killings would, of course, still have to satisfy the relatedness and continuity requirements of RICO's pattern element. See *H. J. Inc.* v. *Northwestern Bell Telephone Co.*, 492 U. S. 229 (1989).

provision to its terms." *Morrison*, 561 U. S., at 265.  Second, RICO defines as racketeering activity only acts that are "indictable" (or, what amounts to the same thing, "charge-able" or "punishable") under one of the statutes identified in §1961(1).  If a particular statute does not apply extra-territorially, then conduct committed abroad is not "in-dictable" under that statute and so cannot qualify as a predicate under RICO's plain terms.

RJR resists the conclusion that RICO's incorporation of extraterritorial predicates gives RICO commensurate extraterritorial effect.  It points out that "RICO itself" does not refer to extraterritorial application; only the underlying predicate statutes do.  Brief for Petitioners 42. RJR thus argues that Congress could have intended to capture only *domestic* applications of extraterritorial predicates, and that any predicates that apply only abroad could have been "incorporated . . . solely for when such offenses are part of a broader pattern whose overall locus is domestic." *Id.*, at 43.

The presumption against extraterritoriality does not require us to adopt such a constricted interpretation. While the presumption can be overcome only by a clear indication of extraterritorial effect, an express statement of extraterritoriality is not essential.  "Assuredly context can be consulted as well." *Morrison*, *supra*, at 265.  Con-text is dispositive here.  Congress has not expressly said that §1962(c) applies to patterns of racketeering activity in foreign countries, but it has defined "racketeering activ-ity"—and by extension a "pattern of racketeering activ-ity"—to encompass violations of predicate statutes that *do* expressly apply extraterritorially.  Short of an explicit declaration, it is hard to imagine how Congress could have more clearly indicated that it intended RICO to have (some) extraterritorial effect.  This unique structure makes RICO the rare statute that clearly evidences extra-territorial effect despite lacking an express statement of

extraterritoriality.

We therefore conclude that RICO applies to some for- eign racketeering activity. A violation of §1962 may be based on a pattern of racketeering that includes predicate offenses committed abroad, provided that each of those offenses violates a predicate statute that is itself extrater- ritorial. This fact is determinative as to §1962(b) and §1962(c), both of which prohibit the employment of a pattern of racketeering. Although they differ as to the end for which the pattern is employed—to acquire or maintain control of an enterprise under subsection (b), or to conduct an enterprise's affairs under subsection (c)—this differ- ence is immaterial for extraterritoriality purposes.

Section 1962(a) presents a thornier question. Unlike subsections (b) and (c), subsection (a) targets certain uses of *income* derived from a pattern of racketeering, not the use of the pattern itself. Cf. *Anza* v. *Ideal Steel Supply Corp.*, 547 U. S. 451, 461–462 (2006). While we have no difficulty concluding that this prohibition applies to in- come derived from foreign patterns of racketeering (within the limits we have discussed), arguably §1962(a) extends only to domestic uses of the income. The Second Circuit did not decide this question because it found that respond- ents have alleged "a domestic investment of racketeering proceeds in the form of RJR's merger in the United States with Brown & Williamson and investments in other U. S. operations." 764 F. 3d, at 138, n. 5. RJR does not dispute the basic soundness of the Second Circuit's reasoning, but it does contest the court's reading of the complaint. See Brief for Petitioners 57–58. Because the parties have not focused on this issue, and because it makes no difference to our resolution of this case, see *infra*, at 27, we assume without deciding that respondents have pleaded a domes- tic investment of racketeering income in violation of §1962(a).

Finally, although respondents' complaint alleges a

violation of RICO's conspiracy provision, §1962(d), the parties' briefs do not address whether this provision should be treated differently from the provision (§1962(a), (b), or (c)) that a defendant allegedly conspired to violate. We therefore decline to reach this issue, and assume without deciding that §1962(d)'s extraterritoriality tracks that of the provision underlying the alleged conspiracy.

### B

RJR contends that, even if RICO may apply to foreign patterns of racketeering, the statute does not apply to foreign *enterprises*. Invoking *Morrison*'s discussion of the Exchange Act's "focus," RJR says that the "focus" of RICO is the enterprise being corrupted—not the pattern of racketeering—and that RICO's enterprise element gives no clear indication of extraterritorial effect. Accordingly, RJR reasons, RICO requires a domestic enterprise.

This argument misunderstands *Morrison*. As explained above, *supra*, at 9–10, only at the second step of the inquiry do we consider a statute's "focus." Here, however, there is a clear indication at step one that RICO applies extraterritorially. We therefore do not proceed to the "focus" step. The *Morrison* Court's discussion of the statutory "focus" made this clear, stating that "[i]f §10(b) did apply abroad, we would not need to determine which transnational frauds it applied to; it would apply to all of them (barring some other limitation)." 561 U. S., at 267, n. 9. The same is true here. RICO—or at least §§1962(b) and (c)—applies abroad, and so we do not need to determine which transnational (or wholly foreign) patterns of racketeering it applies to; it applies to all of them, regardless of whether they are connected to a "foreign" or "domestic" enterprise. This rule is, of course, subject to the important limitation that RICO covers foreign predicate offenses only to the extent that the underlying predicate statutes are extraterritorial. But within those bounds, the

location of the affected enterprise does not impose an independent constraint.

It is easy to see why Congress did not limit RICO to domestic enterprises. A domestic enterprise requirement would lead to difficult line-drawing problems and counter-intuitive results. It would exclude from RICO's reach foreign enterprises—whether corporations, crime rings, other associations, or individuals—that operate within the United States. Imagine, for example, that a foreign corporation has operations in the United States and that one of the corporation's managers in the United States conducts its U. S. affairs through a pattern of extortion and mail fraud. Such domestic conduct would seem to fall well within what Congress meant to capture in enacting RICO. Congress, after all, does not usually exempt foreigners acting in the United States from U. S. legal requirements. See 764 F. 3d, at 138 ("Surely the presumption against extraterritorial application of United States laws does not command giving foreigners carte blanche to violate the laws of the United States in the United States"). Yet RJR's theory would insulate this scheme from RICO liability—both civil and criminal—because the enterprise at issue is a foreign, not domestic, corporation.

Seeking to avoid this result, RJR offers that any "'emissaries'" a foreign enterprise sends to the United States—such as our hypothetical U. S.-based corporate manager—could be carved off and considered a "distinct domestic enterprise" under an association-in-fact theory. Brief for Petitioners 40. RJR's willingness to gerrymander the enterprise to get around its proposed domestic enterprise requirement is telling. It suggests that RJR is not really concerned about whether an enterprise is foreign or domestic, but whether the relevant conduct occurred here or abroad. And if that is the concern, then it is the pattern of racketeering activity that matters, not the enterprise. Even spotting RJR its "domestic emissary" theory, this

approach would lead to strange gaps in RICO's coverage. If a foreign enterprise sent only a single "emissary" to engage in racketeering in the United States, there could be no RICO liability because a single person cannot be both the RICO enterprise and the RICO defendant. *Cedric Kushner Promotions, Ltd.* v. *King*, 533 U. S. 158, 162 (2001).

RJR also offers no satisfactory way of determining whether an enterprise is foreign or domestic. Like the District Court, RJR maintains that courts can apply the "nerve center" test that we use to determine a corporation's principal place of business for purposes of federal diversity jurisdiction. See *Hertz Corp.* v. *Friend*, 559 U. S. 77 (2010); 28 U. S. C. §1332(c)(1); 2011 WL 843957, at *5–*6. But this test quickly becomes meaningless if, as RJR suggests, a corporation with a foreign nerve center can, if necessary, be pruned into an association-in-fact enterprise with a domestic nerve center. The nerve center test, developed with ordinary corporate command structures in mind, is also ill suited to govern RICO association-in-fact enterprises, which "need not have a hierarchical structure or a 'chain of command.'" *Boyle* v. *United States*, 556 U. S. 938, 948 (2009). These difficulties are largely avoided if, as we conclude today, RICO's extraterritorial effect is pegged to the extraterritoriality judgments Congress has made in the predicate statutes, often by providing precise instructions as to when those statutes apply to foreign conduct.

The practical problems we have identified with RJR's proposed domestic enterprise requirement are not, by themselves, cause to reject it. Our point in reciting these troubling consequences of RJR's theory is simply to reinforce our conclusion, based on RICO's text and context, that Congress intended the prohibitions in 18 U. S. C. §§1962(b) and (c) to apply extraterritorially in tandem with the underlying predicates, without regard to the

locus of the enterprise.

Although we find that RICO imposes no domestic enterprise requirement, this does not mean that every foreign enterprise will qualify. Each of RICO's substantive prohibitions requires proof of an enterprise that is "engaged in, or the activities of which affect, interstate or foreign commerce." §§1962(a), (b), (c). We do not take this reference to "foreign commerce" to mean literally all commerce occurring abroad. Rather, a RICO enterprise must engage in, or affect in some significant way, commerce directly involving the United States—*e.g.,* commerce between the United States and a foreign country. Enterprises whose activities lack that anchor to U. S. commerce cannot sustain a RICO violation.

## C

Applying these principles, we agree with the Second Circuit that the complaint does not allege impermissibly extraterritorial violations of §§1962(b) and (c).[7]

The alleged pattern of racketeering activity consists of five basic predicates: (1) money laundering, (2) material support of foreign terrorist organizations, (3) mail fraud, (4) wire fraud, and (5) violations of the Travel Act. The Second Circuit observed that the relevant provisions of the money laundering and material support of terrorism statutes expressly provide for extraterritorial application in certain circumstances, and it concluded that those circumstances are alleged to be present here. 764 F. 3d, at 139–140. The court found that the fraud statutes and the Travel Act do not contain the clear indication needed to overcome the presumption against extraterritoriality. But it held that the complaint alleges *domestic* violations of those statutes because it "allege[s] conduct in the United States that satisfies every essential element of the mail

––––––––––

[7] As to §§1962(a) and (d), see *supra,* at 13–14.

fraud, wire fraud, and Travel Act claims." *Id.*, at 142.

RJR does not dispute these characterizations of the alleged predicates. We therefore assume without deciding that the alleged pattern of racketeering activity consists entirely of predicate offenses that were either committed in the United States or committed in a foreign country in violation of a predicate statute that applies extraterritorially. The alleged enterprise also has a sufficient tie to U. S. commerce, as its members include U. S. companies, and its activities depend on sales of RJR's cigarettes conducted through "the U. S. mails and wires," among other things. App. to Pet. for Cert. 186a, Complaint ¶96. On these premises, respondents' allegations that RJR violated §§1962(b) and (c) do not involve an impermissibly extraterritorial application of RICO.[8]

## IV

We now turn to RICO's private right of action, on which respondents' lawsuit rests. Section 1964(c) allows "[a]ny person injured in his business or property by reason of a violation of section 1962" to sue for treble damages, costs, and attorney's fees. Irrespective of any extraterritorial application of §1962, we conclude that §1964(c) does not overcome the presumption against extraterritoriality. A private RICO plaintiff therefore must allege and prove a *domestic* injury to its business or property.

## A

The Second Circuit thought that the presumption against extraterritoriality did not apply to §1964(c) independently of its application to §1962, reasoning that the

---

[8]We stress that we are addressing only the extraterritoriality question. We have not been asked to decide, and therefore do not decide, whether the complaint satisfies any other requirements of RICO, or whether the complaint in fact makes out violations of the relevant predicate statutes.

presumption "is primarily concerned with the question of what *conduct* falls within a statute's purview." 764 F. 3d, at 151. We rejected that view in *Kiobel*, holding that the presumption "constrain[s] courts considering causes of action" under the ATS, a "'strictly jurisdictional'" statute that "does not directly regulate conduct or afford relief." 569 U. S., at \_\_\_ (slip op., at 5). We reached this conclusion even though the underlying substantive law consisted of well-established norms of international law, which by definition apply beyond this country's borders. See *id.,* at \_\_\_–\_\_\_ (slip op., at 5–7).

The same logic requires that we separately apply the presumption against extraterritoriality to RICO's cause of action despite our conclusion that the presumption has been overcome with respect to RICO's substantive prohibitions. "The creation of a private right of action raises issues beyond the mere consideration whether underlying primary conduct should be allowed or not, entailing, for example, a decision to permit enforcement without the check imposed by prosecutorial discretion." *Sosa* v. *Alvarez-Machain*, 542 U. S. 692, 727 (2004). Thus, as we have observed in other contexts, providing a private civil remedy for foreign conduct creates a potential for international friction beyond that presented by merely applying U. S. substantive law to that foreign conduct. See, *e.g., Kiobel, supra*, at \_\_\_ (slip op., at 6) ("Each of th[e] decisions" involved in defining a cause of action based on "conduct within the territory of another sovereign" "carries with it significant foreign policy implications").

Consider antitrust. In that context, we have observed that "[t]he application . . . of American private treble-damages remedies to anticompetitive conduct taking place abroad has generated considerable controversy" in other nations, even when those nations agree with U. S. substantive law on such things as banning price fixing. *F. Hoffmann-La Roche Ltd* v. *Empagran S. A.*, 542 U. S.

155, 167 (2004). Numerous foreign countries—including some respondents in this case—advised us in *Empagran* that "to apply [U. S.] remedies would unjustifiably permit their citizens to bypass their own less generous remedial schemes, thereby upsetting a balance of competing considerations that their own domestic antitrust laws embody." *Ibid.*[9]

We received similar warnings in *Morrison*, where France, a respondent here, informed us that "most foreign countries proscribe securities fraud" but "have made very

_____

[9] See Brief for Governments of Federal Republic of Germany et al. as *Amici Curiae*, O. T. 2003, No. 03–724, p. 11 (identifying "controversial features of the U. S. legal system," including treble damages, extensive discovery, jury trials, class actions, contingency fees, and punitive damages); *id.,* at 15 ("Private plaintiffs rarely exercise the type of self-restraint or demonstrate the requisite sensitivity to the concerns of foreign governments that mark actions brought by the United States government"); Brief for United Kingdom et al. as *Amici Curiae*, O. T. 2003, No. 03–724, p. 13 ("No other country has adopted the United States' unique 'bounty hunter' approach that permits a private plaintiff to 'recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.' . . . Expanding the jurisdiction of this generous United States private claim system could skew enforcement and increase international business risks. It makes United States courts the forum of choice without regard to whose laws are applied, where the injuries occurred or even if there is any connection to the court except the ability to get *in personam* jurisdiction over the defendants"); see also Brief for Government of Canada as *Amicus Curiae*, O. T. 2003, No. 03–724, p. 14 ("[T]he attractiveness of the [U. S.] treble damages remedy would supersede the national policy decision by Canada that civil recovery by Canadian citizens for injuries resulting from anti-competitive behavior in Canada should be limited to actual damages"). *Empagran* concerned not the presumption against extraterritoriality *per se*, but the related rule that we construe statutes to avoid unreasonable interference with other nations' sovereign authority where possible. See *F. Hoffmann-La Roche Ltd* v. *Empagran S. A.*, 542 U. S. 155, 164 (2004); see also *Hartford Fire Ins. Co.* v. *California*, 509 U. S. 764, 814–815 (1993) (Scalia, J., dissenting) (discussing the two canons). As the foregoing discussion makes clear, considerations relevant to one rule are often relevant to the other.

different choices with respect to the best way to implement that proscription," such as "prefer[ring] 'state actions, not private ones' for the enforcement of law." Brief for Republic of France as *Amicus Curiae*, O. T. 2009, No. 08–1191, p. 20; see *id.,* at 23 ("Even when foreign countries permit private rights of action for securities fraud, they often have different schemes" for litigating them and "may approve of different measures of damages"). Allowing foreign investors to pursue private suits in the United States, we were told, "would upset that delicate balance and offend the sovereign interests of foreign nations." *Id.,* at 26.

Allowing recovery for foreign injuries in a civil RICO action, including treble damages, presents the same danger of international friction. See Brief for United States as *Amicus Curiae* 31–34. This is not to say that friction would necessarily result in every case, or that Congress would violate international law by permitting such suits. It is to say only that there is a potential for international controversy that militates against recognizing foreign-injury claims without clear direction from Congress. Although "a risk of conflict between the American statute and a foreign law" is not a prerequisite for applying the presumption against extraterritoriality, *Morrison*, 561 U. S., at 255, where such a risk is evident, the need to enforce the presumption is at its apex.

Respondents urge that concerns about international friction are inapplicable in this case because here the plaintiffs are not foreign citizens seeking to bypass their home countries' less generous remedies but rather the foreign countries themselves. Brief for Respondents 52–53. Respondents assure us that they "are satisfied that the[ir] complaint . . . comports with limitations on prescriptive jurisdiction under international law and respects the dignity of foreign sovereigns." *Ibid.* Even assuming that this is true, however, our interpretation of §1964(c)'s

injury requirement will necessarily govern suits by non-governmental plaintiffs that are not so sensitive to foreign sovereigns' dignity. We reject the notion that we should forgo the presumption against extraterritoriality and instead permit extraterritorial suits based on a case-by-case inquiry that turns on or looks to the consent of the affected sovereign. See *Morrison, supra,* at 261 ("Rather than guess anew in each case, we apply the presumption in all cases"); cf. *Empagran,* 542 U. S., at 168. Respondents suggest that we should be reluctant to permit a foreign corporation to be sued in the courts of this country for events occurring abroad if the nation of incorporation objects, but that we should discard those reservations when a foreign state sues a U. S. entity in this country under U. S. law—instead of in its own courts and under its own laws—for conduct committed on its own soil. We refuse to adopt this double standard. "After all, in the law, what is sauce for the goose is normally sauce for the gander." *Heffernan* v. *City of Paterson,* 578 U. S. ___, ___ (2016) (slip op., at 6).

B

Nothing in §1964(c) provides a clear indication that Congress intended to create a private right of action for injuries suffered outside of the United States. The statute provides a cause of action to "[a]ny person injured in his business or property" by a violation of §1962. §1964(c). The word "any" ordinarily connotes breadth, but it is insufficient to displace the presumption against extraterritoriality. See *Kiobel,* 569 U. S., at ___ (slip op., at 7). The statute's reference to injury to "business or property" also does not indicate extraterritorial application. If anything, by cabining RICO's private cause of action to particular kinds of injury—excluding, for example, personal injuries—Congress signaled that the civil remedy is not coextensive with §1962's substantive prohibitions.

The rest of §1964(c) places a limit on RICO plaintiffs' ability to rely on securities fraud to make out a claim. This too suggests that §1964(c) is narrower in its application than §1962, and in any event does not support extraterritoriality.

The Second Circuit did not identify anything in §1964(c) that shows that the statute reaches foreign injuries. Instead, the court reasoned that §1964(c)'s extraterritorial effect flows directly from that of §1962. Citing our holding in *Sedima, S. P. R. L.* v. *Imrex Co.*, 473 U. S. 479 (1985), that the "compensable injury" addressed by §1964(c) "necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern," *id.*, at 497, the Court of Appeals held that a RICO plaintiff may sue for foreign injury that was caused by the violation of a predicate statute that applies extraterritorially, just as a substantive RICO violation may be based on extraterritorial predicates. 764 F. 3d, at 151. JUSTICE GINSBURG advances the same theory. See *post,* at 4–5 (opinion concurring in part and dissenting in part). This reasoning has surface appeal, but it fails to appreciate that the presumption against extraterritoriality must be applied separately to both RICO's substantive prohibitions and its private right of action. See *supra,* at 18–22. It is not enough to say that a private right of action must reach abroad because the underlying law governs conduct in foreign countries. Something more is needed, and here it is absent.[10]

Respondents contend that background legal principles allow them to sue for foreign injuries, invoking what they call the "'traditional rule' that 'a plaintiff injured in a foreign country' could bring suit 'in American courts.'"

---

[10] Respondents note that *Sedima* itself involved an injury suffered by a Belgian corporation in Belgium. Brief for Respondents 45–46; see *Sedima, S. P. R. L.* v. *Imrex Co.*, 473 U. S. 479, 483–484 (1985). Respondents correctly do not contend that this fact is controlling here, as the *Sedima* Court did not address the foreign-injury issue.

Brief for Respondents 41 (quoting *Sosa*, 542 U. S., at 706–707). But the rule respondents invoke actually provides that a court will ordinarily "apply *foreign* law to determine the tortfeasor's liability" to "a plaintiff injured in a foreign country." *Id.*, at 706 (emphasis added). Respondents' argument might have force if they sought to sue RJR for violations of *their own laws* and to invoke federal diversity jurisdiction as a basis for proceeding in U. S. courts. See U. S. Const., Art. III, §2, cl. 1 ("The judicial Power [of the United States] shall extend . . . to Controversies . . . between a State, or the Citizens thereof, and foreign States"); 28 U. S. C. §1332(a)(4) ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between . . . a foreign state . . . as plaintiff and citizens of a State or of different States"). The question here, however, is not "whether a federal court has jurisdiction to entertain a cause of action provided by foreign or even international law. The question is instead whether the court has authority to recognize a cause of action *under U. S. law*" for injury suffered overseas. *Kiobel*, *supra*, at ___ (slip op., at 8) (emphasis added). As to that question, the relevant background principle is the presumption against extraterritoriality, not the "traditional rule" respondents cite.

Respondents and JUSTICE GINSBURG point out that RICO's private right of action was modeled after §4 of the Clayton Act, 15 U. S. C. §15; see *Holmes* v. *Securities Investor Protection Corporation*, 503 U. S. 258, 267–268 (1992), which we have held allows recovery for injuries suffered abroad as a result of antitrust violations, see *Pfizer Inc.* v. *Government of India*, 434 U. S. 308, 314–315 (1978). It follows, respondents and JUSTICE GINSBURG contend, that §1964(c) likewise allows plaintiffs to sue for injuries suffered in foreign countries. We disagree. Although we have often looked to the Clayton Act for guid-

ance in construing §1964(c), we have not treated the two
statutes as interchangeable. We have declined to trans-
plant features of the Clayton Act's cause of action into the
RICO context where doing so would be inappropriate. For
example, in *Sedima* we held that a RICO plaintiff need not
allege a special "racketeering injury," rejecting a require-
ment that some lower courts had adopted by "[a]nalog[y]"
to the "antitrust injury" required under the Clayton Act.
473 U. S., at 485, 495.

There is good reason not to interpret §1964(c) to cover
foreign injuries just because the Clayton Act does so.
When we held in *Pfizer* that the Clayton Act allows recov-
ery for foreign injuries, we relied first and foremost on the
fact that the Clayton Act's definition of "person"—which in
turn defines who may sue under that Act—"explicitly
includes 'corporations and associations existing under or
authorized by . . . the laws of any foreign country.'" 434
U. S., at 313; see 15 U. S. C. §12.[11] RICO lacks the lan-
guage that the *Pfizer* Court found critical. See 18 U. S. C.
§1961(3).[12] To the extent that the *Pfizer* Court cited other

——————

[11] *Pfizer* most directly concerned whether a foreign government is a
"person" that may be a Clayton Act plaintiff. But it is clear that the
Court's decision more broadly concerned recovery for foreign injuries,
see 434 U. S., at 315 (expressing concern that "persons doing business
both in this country and abroad might be tempted to enter into anti-
competitive conspiracies affecting American consumers in the expecta-
tion that the illegal profits they could safely extort abroad would offset
any liability to plaintiffs at home"), as respondents themselves contend,
see Brief for Respondents 44 ("[T]his Court clearly recognized in *Pfizer*
that Section 4 extends to foreign injuries"). The Court also permitted
an antitrust plaintiff to sue for foreign injuries in *Continental Ore Co.*
v. *Union Carbide & Carbon Corp.*, 370 U. S. 690 (1962), but the Court's
discussion in that case focused on the extraterritoriality of the underly-
ing antitrust prohibitions, not the Clayton Act's private right of action,
see *id.,* at 704–705, and so sheds little light on the interpretive question
now before us.

[12] This does not mean that foreign plaintiffs may not sue under RICO.
The point is that RICO does not include the explicit foreign-oriented

factors that might apply to §1964(c), they were not sufficient in themselves to show that the provision has extraterritorial effect. For example, the *Pfizer* Court, writing before we honed our extraterritoriality jurisprudence in *Morrison* and *Kiobel*, reasoned that Congress "[c]learly . . . did not intend to make the [Clayton Act's] treble-damages remedy available only to consumers in our own country" because "the antitrust laws extend to trade 'with foreign nations' as well as among the several States of the Union." 434 U. S., at 313–314. But we have emphatically rejected reliance on such language, holding that "'even statutes . . . that expressly refer to "*foreign* commerce" do not apply abroad.'" *Morrison*, 561 U. S., at 262–263. This reasoning also fails to distinguish between extending *substantive antitrust law* to foreign conduct and extending a *private right of action* to foreign injuries, two separate issues that, as we have explained, raise distinct extraterritoriality problems. See *supra,* at 18–22. Finally, the *Pfizer* Court expressed concern that it would "defeat th[e] purposes" of the antitrust laws if a defendant could "escape full liability for his illegal actions." 434 U. S., at 314. But this justification was merely an attempt to "divin[e] what Congress would have wanted" had it considered the question of extraterritoriality—an approach we eschewed in *Morrison*. 561 U. S., at 261. Given all this, and in particular the fact that RICO lacks the language that *Pfizer* found integral to its decision, we decline to extend this aspect of our Clayton Act jurisprudence to RICO's cause of action.

Underscoring our reluctance to read §1964(c) as broadly as we have read the Clayton Act is Congress's more recent decision to define precisely the antitrust laws' extraterritorial effect and to exclude from their reach most conduct that "causes only foreign injury." *Empagran*, 542 U. S., at

--------

language that the *Pfizer* Court found to support foreign-injury suits under the Clayton Act.

158 (describing Foreign Trade Antitrust Improvements
Act of 1982); see also *id.,* at 169–171, 173–174 (discussing
how the applicability of the antitrust laws to foreign inju-
ries may depend on whether suit is brought by the Gov-
ernment or by private plaintiffs).   Although this later
enactment obviously does not limit §1964(c)'s scope by its
own force, it does counsel against importing into RICO
those Clayton Act principles that are at odds with our
current extraterritoriality doctrine.

## C

Section 1964(c) requires a civil RICO plaintiff to allege
and prove a domestic injury to business or property and
does not allow recovery for foreign injuries.  The applica-
tion of this rule in any given case will not always be self-
evident, as disputes may arise as to whether a particular
alleged injury is "foreign" or "domestic."  But we need not
concern ourselves with that question in this case.  As this
case was being briefed before this Court, respondents filed
a stipulation in the District Court waiving their damages
claims for domestic injuries.  The District Court accepted
this waiver and dismissed those claims with prejudice.
Respondents' remaining RICO damages claims there-
fore rest entirely on injury suffered abroad and must be
dismissed.[13]

_____

[13] In respondents' letter notifying this Court of the waiver of their
domestic-injury damages claims, respondents state that "[n]othing in
the stipulation will affect respondents' claims for equitable relief,
including claims for equitable relief under state common law that are
not at issue in this case before this Court."  Letter from David C.
Frederick, Counsel for Respondents, to Scott S. Harris, Clerk of Court
(Feb. 29, 2016).  Although the letter mentions only state-law claims for
equitable relief, Count 5 of respondents' complaint seeks equitable
relief under RICO.  App. to Pet. for Cert. 260a–262a, Complaint ¶¶181–
188.  This Court has never decided whether equitable relief is available
to private RICO plaintiffs, the parties have not litigated that question
here, and we express no opinion on the issue today.  We note, however,

\*          \*          \*

The judgment of the United States Court of Appeals for the Second Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE SOTOMAYOR took no part in the consideration or decision of this case.

———————

that any claim for equitable relief under RICO based on foreign injuries is necessarily foreclosed by our holding that §1964(c)'s cause of action requires a domestic injury to business or property. It is unclear whether respondents intend to seek equitable relief under RICO based on domestic injuries, and it may prove unnecessary to decide whether §1964(c) (or respondents' stipulation) permits such relief in light of respondents' state-law claims. We leave it to the lower courts to determine, if necessary, the status and availability of any such claims.

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–138

_____

## RJR NABISCO, INC., ET AL., PETITIONERS *v.* EUROPEAN COMMUNITY, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 20, 2016]

JUSTICE GINSBURG, with whom JUSTICE BREYER and JUSTICE KAGAN join, concurring in Parts I, II, and III and dissenting from Part IV and from the judgment.

In enacting the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U. S. C. §1961 *et seq.*, Congress sought to provide a new tool to combat "organized crime and its economic roots." *Russello* v. *United States*, 464 U. S. 16, 26 (1983). RICO accordingly proscribes various ways in which an "enterprise," §1961(4), might be controlled, operated, or funded by a "pattern of racketeering activity," §1961(1), (5). See §1962.[1] RICO builds on predicate statutes, many of them applicable extraterritorially. App. to Brief for United States as *Amicus Curiae* 27a–33a. Congress not only armed the United States with authority to initiate criminal and civil proceedings to enforce RICO, §§1963, 1964(b), Congress also created in §1964(c) a private right of action for "[a]ny person injured in his business or property by reason of a violation of [RICO's sub-

_____

[1] The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U. S. C. §1961 *et seq.*, makes it unlawful "to . . . invest" in an enterprise income derived from a pattern of racketeering activity, §1962(a), "to acquire or maintain" an interest in an enterprise through a pattern of racketeering activity, §1962(b), "to conduct or participate . . . in the conduct" of an enterprise through a pattern of racketeering activity, §1962(c), or "to conspire" to violate any of those provisions, §1962(d).

stantive provision]."

Invoking this right, respondents, the European Community and 26 member states, filed suit against petitioners, RJR Nabisco, Inc., and related entities. Alleging that petitioners orchestrated from their U. S. headquarters a complex money-laundering scheme in violation of RICO, respondents sought to recover for various injuries, including losses sustained by financial institutions and lost opportunities to collect duties. See *ante,* at 4–7. Denying respondents a remedy under RICO, the Court today reads into §1964(c) a domestic-injury requirement for suits by private plaintiffs nowhere indicated in the statute's text. Correctly, the Court imposes no such restriction on the United States when it initiates a civil suit under §1964(b). Unsupported by RICO's text, inconsistent with its purposes, and unnecessary to protect the comity interests the Court emphasizes, the domestic-injury requirement for private suits replaces Congress' prescription with one of the Court's own invention. Because the Court has no authority so to amend RICO, I dissent.

I

As the Court recounts, *ante,* at 7, "Congress ordinarily legislates with respect to domestic, not foreign, matters." *Morrison* v. *National Australia Bank Ltd.*, 561 U. S. 247, 255 (2010). So recognizing, the Court employs a presumption that "'legislation . . . is meant to apply only within the territorial jurisdiction of the United States.'" *Ibid.* (quoting *EEOC* v. *Arabian American Oil Co.*, 499 U. S. 244, 248 (1991) (*Aramco*)). But when a statute demonstrates Congress' "affirmative inten[t]" that the law should apply beyond the borders of the United States, as numerous RICO predicate statutes do, the presumption is rebutted, and the law applies extraterritorially to the extent Congress prescribed. See *Morrison*, 561 U. S., at 255 (quoting *Aramco*, 499 U. S., at 248). The presumption, in short,

aims to distinguish instances in which Congress consciously designed a statute to reach beyond U. S. borders, from those in which nothing plainly signals that Congress directed extraterritorial application.

In this case, the Court properly holds that Congress signaled its "affirmative inten[t]," *Morrison*, 561 U. S., at 255, that RICO, in many instances, should apply extraterritorially. See *ante,* at 10–18; App. to Brief for United States as *Amicus Curiae* 27a–33a. As the Court relates, see *ante,* at 10–14, Congress deliberately included within RICO's compass predicate federal offenses that manifestly reach conduct occurring abroad. See, *e.g.,* §§1956–1957 (money laundering); §2339B (material support to foreign terrorist organizations). Accordingly, the Court concludes, when the predicate crimes underlying invocation of §1962 thrust extraterritorially, so too does §1962. I agree with that conclusion.

I disagree, however, that the private right of action authorized by §1964(c) requires a domestic injury to a person's business or property and does not allow recovery for foreign injuries. One cannot extract such a limitation from the text of §1964(c), which affords a right of action to "[a]ny person injured in his business or property by reason of a violation of section 1962." Section 1962, at least subsections (b) and (c), all agree, encompasses foreign injuries. How can §1964(c) exclude them when, by its express terms, §1964(c) is triggered by "a violation of section 1962"? To the extent RICO reaches injury abroad when the Government is the suitor pursuant to §1962 (specifying prohibited activities) and §1963 (criminal penalties) or §1964(b) (civil remedies), to that same extent, I would hold, RICO reaches extraterritorial injury when, pursuant to §1964(c), the suitor is a private plaintiff.

## II
## A

I would not distinguish, as the Court does, between the extraterritorial compass of a private right of action and that of the underlying proscribed conduct. See *ante,* at 18–22, 23, 26. Instead, I would adhere to precedent addressing RICO, linking, not separating, prohibited activities and authorized remedies. See *Sedima, S. P. R. L.* v. *Imrex Co.*, 473 U. S. 479, 495 (1985) ("If the defendant engages in a pattern of racketeering activity in a manner forbidden by [§1962], and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under §1964(c)."); *ibid.* (refusing to require a "distinct 'racketeering injury'" for private RICO actions under §1964(c) where §1962 imposes no such requirement).[2]

To reiterate, a §1964(c) right of action may be maintained by "[a]ny person injured in his business or property by reason of a violation of *section 1962*" (emphasis added). "[I]ncorporating one statute . . . into another," the Court has long understood, "serves to bring into the latter all that is fairly covered by the reference." *Panama R. Co.* v. *Johnson*, 264 U. S. 375, 392 (1924). RICO's private right of action, it cannot be gainsaid, expressly incorporates §1962, whose extraterritoriality, the Court recognizes, is coextensive with the underlying predicate offenses

———————

[2] Insisting that the presumption against extraterritoriality should "apply to §1964(c) independently of its application to §1962," *ante,* at 18–19, the Court cites *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U. S. ___ (2013). That decision will not bear the weight the Court would place on it. As the Court comprehends, the statute there at issue, the Alien Tort Statute, 28 U. S. C. §1350, is a spare jurisdictional grant that itself does not "regulate conduct or afford relief." *Kiobel*, 569 U. S., at ___ (slip op., at 5). With no grounding for extraterritorial application in the statute, *Kiobel* held, courts have no warrant to fashion, on their own initiative, claims for relief that operate extraterritorially. See *ibid.* ("[T]he question is not what Congress has done but instead what courts may do.").

charged. See *ante,* at 10–18. See also *ante,* at 12 ("[I]t is hard to imagine how Congress could have more clearly indicated that it intended RICO to have (some) extraterritorial effect."). The sole additional condition §1964(c) imposes on access to relief is an injury to one's "business or property." Nothing in that condition should change the extraterritoriality assessment. In agreement with the Second Circuit, I would hold that "[i]f an injury abroad was proximately caused by the violation of a statute which Congress intended should apply to injurious conduct performed abroad, [there is] no reason to import a domestic injury requirement simply because the victim sought redress through the RICO statute." 764 F. 3d 149, 151 (2014).

What §1964(c)'s text conveys is confirmed by its history. As this Court has repeatedly observed, Congress modeled §1964(c) on §4 of the Clayton Act, 15 U. S. C. §15, the private civil-action provision of the federal antitrust laws, which employs nearly identical language: "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor." See *Klehr* v. *A. O. Smith Corp.,* 521 U. S. 179, 189–190 (1997); *Holmes* v. *Securities Investor Protection Corporation,* 503 U. S. 258, 267–268 (1992); *Sedima,* 473 U. S., at 485, 489. Clayton Act §4, the Court has held, provides a remedy for injuries both foreign and domestic. *Pfizer Inc.* v. *Government of India,* 434 U. S. 308, 313–314 (1978) ("Congress did not intend to make the [Clayton Act's] treble-damages remedy available only to consumers in our own country."); *Continental Ore Co.* v. *Union Carbide & Carbon Corp.,* 370 U. S. 690, 707–708 (1962) (allowing recovery in Clayton Act §4 suit for injuries in Canada).

"The similarity of language in [the two statutes] is, of course, a strong indication that [they] should be interpreted *pari passu,*" *Northcross* v. *Board of Ed. of Memphis City Schools,* 412 U. S. 427, 428 (1973) (*per curiam*), and I see

no contradictory indication here.[3]  Indeed, when the Court has addressed gaps in §1964(c), it has aligned the RICO private right of action with the private right afforded by Clayton Act §4.  See, *e.g., Klehr*, 521 U. S., at 188–189 (adopting for private RICO actions Clayton Act §4's accrual rule—that a claim accrues when a defendant commits an act that injures a plaintiff's business—rather than criminal RICO's "most recent, predicate act" rule); *Holmes*, 503 U. S., at 268 (requiring private plaintiffs under §1964(c), like private plaintiffs under Clayton Act §4, to show proximate cause); *Agency Holding Corp.* v. *Malley-Duff & Associates, Inc.*, 483 U. S. 143, 155–156 (1987) (applying to §1964(c) actions Clayton Act §4's shorter statute of limitations instead of "catchall" federal statute of limitations applicable to RICO criminal prosecutions).

This very case illustrates why pinning a domestic-injury requirement onto §1964(c) makes little sense.  All defendants are U. S. corporations, headquartered in the United States, charged with a pattern of racketeering activity directed and managed from the United States, involving

---

[3] The Court asserts that "[t]here is good reason not to interpret §1964(c) to cover foreign injuries just because the Clayton Act does." *Ante,* at 25.  The Clayton Act's definition of "person," 15 U. S. C. §12, the Court observes, "explicitly includes 'corporations and associations existing under or authorized by . . . the laws of any foreign country.'" *Ante*, at 25 (some internal quotation marks omitted).  RICO, the Court stresses, lacks this "critical" language. *Ibid.*  The Court's point is underwhelming.  RICO's definition of "persons" is hardly confining: "any individual or entity capable of holding a legal or beneficial interest in property."  18 U. S. C. §1961(3).  Moreover, there is little doubt that Congress anticipated §1964(c) plaintiffs like the suitors here.  See 147 Cong. Rec. 20676, 20710 (2001) (remarks of Sen. Kerry) ("Since some of the money-laundering conducted in the world today also defrauds foreign governments, it would be hostile to the intent of [the USA PATRIOT Act, which added as RICO predicates additional money laundering offenses,] for us to interject into the statute any rule of construction of legislative language which would in any way limit our foreign allies access to our courts to battle against money laundering.").

conduct occurring in the United States. In particular, according to the complaint, defendants received in the United States funds known to them to have been generated by illegal narcotics trafficking and terrorist activity, conduct violative of §1956(a)(2); traveled using the facilities of interstate commerce in furtherance of unlawful activity, in violation of §1952; provided material support to foreign terrorist organizations "in the United States and elsewhere," in violation of §2339B; and used U. S. mails and wires in furtherance of a "scheme or artifice to defraud," in violation of §§1341 and 1343. App. to Pet. for Cert. 238a–250a. In short, this case has the United States written all over it.

### B

The Court nevertheless deems a domestic-injury requirement for private RICO plaintiffs necessary to avoid international friction. See *ante,* at 20–22. When the United States considers whether to initiate a prosecution or civil suit, the Court observes, it will take foreign-policy considerations into account, but private parties will not. It is far from clear, however, that the Court's blanket rule would ordinarily work to ward off international discord. Invoking the presumption against extraterritoriality as a bar to *any* private suit for injuries to business or property abroad, this case suggests, might spark, rather than quell, international strife. Making such litigation available to domestic but not foreign plaintiffs is hardly solicitous of international comity or respectful of foreign interests. Cf. *Pfizer*, 434 U. S., at 318–319 ("[A] foreign nation is generally entitled to prosecute any civil claim in the courts of the United States upon the same basis as a domestic corporation or individual might do. To deny him this privilege would manifest a want of comity and friendly feeling." (internal quotation marks omitted)).

RICO's definitional provisions exclude "[e]ntirely foreign

activity." 783 F. 3d 123, 143 (Lynch, J., dissenting from denial of rehearing en banc). Thus no suit under RICO would lie for injuries resulting from "[a] pattern of murders of Italian citizens committed by members of an Italian organized crime group in Italy." *Ibid.* That is so because "murder is a RICO predicate only when it is 'chargeable under state law' or indictable under specific federal statutes." *Ibid.* (citing §1961(1)(A), (G)).

To the extent extraterritorial application of RICO could give rise to comity concerns not present in this case, those concerns can be met through doctrines that serve to block litigation in U. S. courts of cases more appropriately brought elsewhere. Where an alternative, more appropriate forum is available, the doctrine of *forum non conveniens* enables U. S. courts to refuse jurisdiction. See *Piper Aircraft Co.* v. *Reyno*, 454 U. S. 235 (1981) (dismissing wrongful-death action arising out of air crash in Scotland involving only Scottish victims); Restatement (Second) of Conflict of Laws §84 (1969). Due process constraints on the exercise of general personal jurisdiction shelter foreign corporations from suit in the United States based on conduct abroad unless the corporation's "affiliations with the [forum] in which suit is brought are so constant and pervasive 'as to render it essentially at home [there].'" *Daimler AG* v. *Bauman*, 571 U. S. ___, ___–___ (2014) (slip op., at 2–3) (quoting *Goodyear Dunlop Tires Operations, S. A.* v. *Brown*, 564 U. S. 915, 919 (2011); alterations omitted). These controls provide a check against civil RICO litigation with little or no connection to the United States.

\* \* \*

The Court hems in RICO out of concern about establishing a "double standard." *Ante,* at 22. But today's decision does exactly that. U. S. defendants commercially engaged here and abroad would be answerable civilly to U. S.

victims of their criminal activities, but foreign parties similarly injured would have no RICO remedy. "'Sauce for the goose'" should indeed serve the gander as well. See *ibid.* (quoting *Heffernan* v. *City of Paterson*, 578 U. S. \_\_\_, \_\_\_ (2016) (slip op., at 6)). I would resist reading into §1964(c) a domestic-injury requirement Congress did not prescribe. Instead, I would affirm the Second Circuit's sound judgment:

> "To establish a compensable injury under §1964(c), a private plaintiff must show that (1) the defendant 'engage[d] in a pattern of racketeering activity in a manner forbidden by' §1962, and (2) that these 'racketeering activities' were the proximate cause of some injury to the plaintiff's business or property." 764 F. 3d, at 151 (quoting *Sedima*, 473 U. S., at 495; *Holmes*, 503 U. S., at 268)).

Because the Court overturns that judgment, I dissent.

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–138

_____

RJR NABISCO, INC., ET AL., PETITIONERS *v.*
EUROPEAN COMMUNITY, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 20, 2016]

JUSTICE BREYER, concurring in part, dissenting in part, and dissenting from the judgment.

I join Parts I through III of the Court's opinion. But I do not join Part IV. The Court there holds that the private right of action provision in the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U. S. C. §1964(c), has no extraterritorial application. Like JUSTICE GINSBURG, I believe that it does.

In saying this, I note that this case does not involve the kind of purely foreign facts that create what we have sometimes called "foreign-cubed" litigation (*i.e.,* cases where the plaintiffs are foreign, the defendants are foreign, and all the relevant conduct occurred abroad). See, *e.g., Morrison* v. *National Australia Bank Ltd.*, 561 U. S. 247, 283, n. 11 (2010) (Stevens, J., concurring in judgment). Rather, it has been argued that the statute at issue does not extend to such a case. See 18 U. S. C. §1961(1) (limiting qualifying RICO predicates to those that are, *e.g.,* "chargeable" under state law, or "indictable" or "punishable" under federal law); Tr. of Oral Arg. 32, 33–34 (respondents conceding that all of the relevant RICO predicates require some kind of connection to the United States). And, as JUSTICE GINSBURG points out, "this case has the United States written all over it." *Ante,* at 7 (opinion concurring in part, dissenting in part, and dissenting

from judgment).

Unlike the Court, I cannot accept as controlling the Government's argument as *amicus curiae* that "[a]llowing recovery for foreign injuries in a civil RICO action . . . presents the . . . danger of international friction." *Ante,* at 21. The Government does not provide examples, nor apparently has it consulted with foreign governments on the matter. See Tr. of Oral Arg. 26 ("[T]o my knowledge, [the Government] didn't have those consultations" with foreign states concerning this case). By way of contrast, the European Community and 26 of its member states tell us "that the complaint in this case, which alleges that American corporations engaged in a pattern of racketeering activity that caused injury to respondents' businesses and property, comports with limitations on prescriptive jurisdiction under international law and respects the dignity of foreign sovereigns." Brief for Respondents 52–53; see also Tr. of Oral Arg. 31 (calling the European Union's "vett[ing] exercise" concerning this case "comprehensiv[e]"). In these circumstances, and for the reasons given by JUSTICE GINSBURG, see *ante,* at 7–8, I would not place controlling weight on the Government's contrary view.

Consequently, I join JUSTICE GINSBURG's opinion.